IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent-Plaintiff, | § | |
| | § | |
| v. | § | CR H-06-237-02-S |
| | § | (CA H-10-667) |
| EUGENE H. WILLIAMS, JR., | § | |
| Petitioner-Defendant. | § | |

GOVERNMENT'S RESPONSE AND ANSWER TO WILLIAMS'S
MOTION TO VACATE SENTENCE UNDER 28 U.S.C. § 2255

1.

On April 20, 2007, Williams received 120 months under superseding count
one; and concurrent 68 month sentences under superseding counts two through five;
and 12 months under superseding count six for a total of 120 months. Williams was
ordered to serve concurrent two year terms of supervised release under superseding
counts one through five, and a one year term of supervised release under superseding
count six.  He was also ordered to pay $525 in special costs (Doc. 151, pp. 21-25).
The judgment was entered on April 30, 2007 (Doc. 499).   He unsuccessfully
appealed. *United States v. Williams*, 303 Fed Appx 231 (5th Cir. Dec. 18, 2008)
(unpublished).  No petition for *certiorari* was filed in the Supreme Court. According
to the Bureau of Prisons website, www.bop.com, Williams's projected release date
is January 2, 2016.

On February 26, 2010, Williams filed the instant motion to vacate sentence (Doc. 173).  This Court ordered government response to the petition (Doc. 174).  The government files this answer in response to Williams's pleading; moves for dismissal; and in the alterative, moves for summary judgment.

2.

The government denies each and every allegation of fact made by Williams, except those supported by the record and those specifically admitted herein, and demands proof thereof.

3.

Williams was named in a superseding indictment on August 17, 2006, in the Southern District of Texas, Houston Division in CR H-06-237-02-S, and charged with receipt and possession of one or more unregistered firearms and destructive devices, listing 39 stun grenades, committed on August 31, 2004, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871 (count one); receipt and possession of unlawfully transferred firearms, listing 34, committed August 31, 2004, in violation of 26 U.S.C. §§ 5812, 5861(b), and 5871 (count two); possession of a firearm not registered to Williams in the National Firearms Registration and Transfer Record, namely a precision ordinance tactical blast stun grenade, Model T-429, committed  July 18, 2004, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871 (count three); possession

of a firearm not registered to Williams in the National Firearms Registration and Transfer Record, namely a destructive device defined in 26 U.S.C. § 5845, committed August 27, 2004, in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871 (count four); possession of one or more firearms which were not identified by serial number, committed August 31, 2004, in violation of 26 U.S.C. §§5842(c), 5861(i) and 5871 (count five); and aiding and abetting the unlawful storage of high explosives, listing 78, committed between October 5, 2002 through August 31, 2004, in violation of 18 U.S.C. §§ 2, 842(j), and 844(b), and 27 C.F.R. §§55.201 *et seq.* (count six) (Doc. 19).

On November 6, 2006, Williams filed notice of public authority defense (Doc. 58).  The government responded to the notice on November 14, 2006 (Doc. 60).  A final pre-trial hearing was held on November 30, 2006 (Doc. 76; Doc. 155, pp. 572-704). In pertinent part, the issue of a "public authority" defense was discussed during the proceeding (Doc. 155, pp. 623, 629-35, 637-39, 641, 646-52).  The court indicated a willingness to permit the defense to present evidence of a "public authority" defense, understanding that entitlement to a jury instruction at the end of the case may not be established (Doc. 155, pp. 646-52).

On November 29, 2006, Williams apparently forwarded a copy of a supplemental notice of public authority defense to the government, but the docket was not filed. Nevertheless, the government responded to the pleading on

3

December 1, 2006 (Doc. 83).

A jury was selected on December 4, 2006, and trial commenced on December 5, 2006 (Docs. 86, 157, 158). Williams was represented at trial by retained attorneys Scot Courtney and Gregory Cagle (Docs. 47, 157-63).  The government's presentation of evidence continued through the fourth day of trial, when Williams moved for acquittal at the close of the government's presentation of evidence under Fed. R. Crim. P. 29 (Doc. 93; Doc.  160, pp. 881-89).

But on the third day of the trial, the district court, as it had previously ruled on November 29, 2006 [*see* Doc.  155, pp. 646-52], permitted evidence on the issue of the "public authority defense," although it reserved the final decision to instruct the jury on the defense (Doc. 159, pp. 1210-13).  The court supplied the following instruction *several* times:

> The public authority defense is available when a defendant is engaged by a government official to participate or assist in a covert activity. It is limited to those situations when a government agent in fact had the authority to empower a defendant to perform the acts in question, and a defendant must show that his reliance on governmental authority was both reasonable and sincere; that is, a reasonable belief that he was acting as an authorized agent.

(Doc. 159, p. 1212). Later that same day, inquiry again was made into the basis for justifying establishment of the affirmative defense of "public authority." (Doc. 159,

4

pp. 1424-33).  Again, the court reiterated that it had not finalized the decision whether to instruct the jury on the public authority defense (Doc. 159, p. 1428).

Williams filed a motion to dismiss the indictment based upon the theory that the statutes involved in counts one through four and six were void for vagueness as applied to him.  The motion was denied. (Doc. 160, pp. 1586-94).  After the close of the presentation of all evidence and on the sixth day of trial, Williams unsuccessfully renewed his motion to dismiss (Doc. 162, p. 1844).

At the close of the defense side of the case, the government urged the court to address the issue of the public authority defense. (Doc. 161, p. 1788).  The court excused the jury and inquired of Williams's counsel where evidence was presented justifying the submission of a jury instruction on the public authority defense (Doc. 161, pp. 1792-1813).  The government relied upon Fifth Circuit precedent and the proposition that "[t]he 'public authority' defense . . . requires a defendant to show that he was engaged by a government official to participate in covert activity."], citing *United States v. Ashlock*, 105 Fed Appx 581 (5th Cir. 2004); *United States v. Spires*, 79 F.3d 464, 466 n. 2 (5th Cir. 1996), *vacated on other grounds*, 543 U.S. 1136 (2005); *United States v. Fox*, 248 F.3d 394, 408 (5th Cir. 2001), *vacated on other grounds*, 535 U.S. 1014 (2002); *United States v.  Maryfield*, 31 Fed Appx 160 (5th Cir. 2001); *United States v. Apperson*, 441 F.3d 1162, 1204 (10th Cir. 2004) ("The

public authority defense requires a defendant to show that he was engaged by a government official to participate in a covert activity."). The government also quoted *Apperson*, noting:

> there must be an active misleading by a government agent, and actual reliance by the defendant which is reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.... Further, "the government agent must be one who is 'responsible for interpreting, administering, or enforcing the law defining the offense.'"

441 F.3d at 1204-05 (*See* Doc. 161, pp. 1794-1804).

Counsel for Williams conceded that his theory for the defense could not rely upon Fifth Circuit precedent; instead he relied upon language from the Eighth and Ninth Circuits, citing *United States v. Achter*, 52 F.3d 753 755 (8th Cir. 1995) (affirming denial of refusal to instruct because the public authority defense "require[s] a defendant to establish that he reasonably relied on the representations of a government official" and Achter did not so prove); *United States v. Parker*, 267 F.3d 839 (8th Cir. 2001) (in affirming denial of issuance of instruction, court held "that the public authority defense requires a defendant to show that he was engaged by a government official to participate in a covert activity," citing *Achter*, and "the evidence to support a theory of defense need not be overwhelming; a defendant is entitled to an instruction on a theory of defense even though the evidentiary basis for

6

that theory is weak, inconsistent, or of doubtful credibility." (citation omitted)); and

*United States v. Bear*, 439 F.3d 565, 568-69 (9th Cir. 2006) (finding plain error to fail

to instruct the jury on the public authority defense and applying rule that  "[t]he

public authority defense is properly used when the defendant reasonably believed that

a government agent authorized her to engage in illegal acts. See Ninth Circuit Manual

of Model Criminal Jury Instructions, Instruction 6.10 (2003).") (Doc. 161, pp. 1804-

07).

On the court if counsel could identify a case, absent the existence

of a confidential informant or cooperating defendant, where the "public authority

defense instruction" was approved, counsel conceded he had not found any such case,

but relied upon *United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Illinois 2006)

(where  current law enforcement officer, who was the lead rifle instructor for the

Illinois State Police, was arrested for the possession of a single machine gun and

applicable statute was held to be unconstitutionally vague as to him) (Doc. 161, pp.

1807-08). The government distinguished the facts of *Vest* to the instant facts, and the

court denied the request "to invoke the public authority defense" (Doc. 161, pp. 1809-

13).

On the seventh day of trial, Williams was convicted as charged (Doc. 100; Doc.

163, pp. 1218-19).

7

In the revised PSR, the probation department scored Williams at base level 18 under USSG §2K2.1(a)(5) (2003 Sentencing Guideline Manual), increased six levels for the unlawful possession of 86 destructive devices under § 2K2.1(b)(1)(C) and an additional two levels under § 2K2.1(b)(3) for an offense involving a destructive device other than a portable rocket or missile (PSR, ¶¶38-41).  The department also recommended a two-level upward adjustment for possession of at least one firearm with an altered or obliterated serial number under USSG § 2K2.1(b)(4)(B), and a two four level upward adjustment for possession of the firearms and destructive devices in connection with felony offenses of aggravated assault and tampering with evidence under § 2K2.1(b)(5) (PSR, ¶¶ 42, 43).  Further, the department recommended a two level upward adjustment for abuse of position of trust under USSG § 3B1.3 and a two-level upward adjustment for obstruction of justice under § 3C1.1, for a total offense level score of 36 (PSR, ¶¶45-49).  No reductions were recommended, and Williams had no criminal history points, resulting in a punishment range for level 36, criminal history category (chc) I of 188 to 235 months imprisonment (PSR, ¶¶51-54, 86). However, the statutory maximum term for superseding counts one through five was ten years, and the maximum term under superseding count six was one year (PSR, ¶ 85).

Williams filed written objections to the PSR, including a challenge to the two-

level increase for obstruction of justice (Objections filed under seal; Addendum to the PSR).  His sentencing has been summarized in Part 1, *supra*.

After notice of appeal was filed, attorneys Courtney and Cagle successfully moved to withdraw (Docs. 132-34). Williams was permitted to proceed *in forma pauperis,* and attorney David Adler was appointed to represent Williams on appeal (*See* Docs 140-49).

4.

The pleading under 28 U.S.C. § 2255 is timely.  *See United States v. Gamble*, 208 F.3d 536 (5th Cir. 2000).  The court has jurisdiction over the subject matter and the parties under 28 U.S.C. §2255 (eff. April 24, 1996).  Williams seeks federal habeas corpus relief pursuant to § 2255 from his conviction in the Houston Division of the Southern District of Texas.  A § 2255 motion "provides the primary means of collaterally attacking a federal conviction and sentence." *Jeffers v. Chandler*, 234 F.3d 277, 279 (5th Cir. 2000) (citation omitted).  Relief under a § 2255 motion "is warranted for errors that occurred  at trial or sentencing." *Id.*  He seeks relief from his conviction and sentence, and the relief sought under § 2255 is appropriate .

5.

## ALLEGATIONS

Williams raises one ground of error.  He argues that he received ineffective assistance of counsel on appeal.  Williams contends that attorney Adler rendered constitutionally deficient representation by not pursuing on appeal the denial of an instruction on the "public authority defense."

6.

## General Rules

The four grounds justifying relief under 28 U.S.C. § 2255 are (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) that the sentence was "in excess of the maximum authorized by law"; and (4) that the sentence is otherwise "subject to collateral attack". 28 U.S.C. § 2255 (2000); *United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995).  After a conviction and exhaustion or waiver of any right to appeal, a court is usually "entitled to presume that the defendant stands fairly and finally convicted." *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001) (citing *United States v. Frady*, 456 U.S. 152, 164, 102 S.Ct. 1584, 1592-93 (1982); *United States v. Shaid*, 937 F.2d 228, 231-32 (5th Cir. 1991)). Thus motions to vacate sentences "may raise only constitutional errors and other injuries

that could not have been raised on direct appeal that will result in a miscarriage of justice if left unaddressed." *United States v. Williamson*, 183 F.3d 458, 462 (5ᵗʰ Cir. 1999) (citations omitted); *see Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 2305 (1974); *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471 (1962).

To obtain post-conviction relief in a collateral attack, a defendant must show either (1) cause excusing his procedural default and actual prejudice resulting from the alleged error, *see Frady*, 456 U.S. at 167-68, 102 S.Ct. at 1594, or (2) that he is actually innocent. *Shaid*, 937 F.2d at 232. "'Actual innocence' means 'factual innocence, and not mere legal insufficiency.'" *Bousley v. United States*, 523 U.S. 614, 623-24, 118 S.Ct. 1604, 1611-12 (1998); *United States v. Torres*, 163 F.3d 909, 911 n.9 (5ᵗʰ Cir. 1999). To prove actual innocence, the petitioner "must demonstrate that, in light of all the evidence, it is more likely than not that no fact finder] would have convicted him." *Id.* (citations and quotations omitted).

In the context of ineffective assistance of counsel, Williams is required to "show that: (1) his attorney's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that except for the attorney's unprofessional errors, the results of the proceeding would have been different." *United States v. Bounds*, 943 F.2d 541, 544 (5ᵗʰ Cir. 1991) (citations omitted). Those requirements are based upon a showing that trial counsel's performance was

constitutionally deficient, and that deficiency prejudiced the defendant. *See United States v. Reinhart*, 357 F.3d 521, 524 & n.8 (5th Cir. 2004) (citing, *inter alia*, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984) and *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999)). The rule applies to both appointed and retained counsel. *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980). "An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *United States v. Kimler*, 167 F.3d 889, 892 (5th Cir. 1999) (citations omitted).

A claim of ineffective assistance of counsel may be rejected based on an insufficient showing of prejudice, without inquiry into the adequacy of counsel's performance. *Micheaux v. Collins*, 911 F.2d 1083, 1090-91 (5th Cir. 1990). The failure to prove both components of the *Strickland* test, either a deficient performance or actual prejudice, defeats an ineffective assistance claim. *United States v. Abner*, 825 F.2d 835, 846 n. 18 (5th Cir. 1987); *see also United States v. Gaudet*, 81 F.3d 585, 592 (5th Cir. 1996); *United States v. Rosalez-Orozco*, 8 F.3d 198, 199 (5th Cir. 1993) (citations omitted).

Failure of appellate counsel to raise a specific issue on appeal may form the basis to establish cause for a procedural default and constitutionally ineffective

assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488-92 (1986). Nevertheless, the Sixth Amendment does not require counsel to raise all nonfrivolous issues on appeal, even if the defendant specifically requests that a particular issue be raised. *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983); *Sharp v. Puckett*, 930 F.2d 450, 452 (5th Cir. 1991).

7.

**Summary of Facts**

Williams, a supervisor at the Cypress Creek Advanced Tactical Team (CCATT) of the Cypress Creek Emergency Medical Services (CCEMS), threw a bachelor party on the evening of August 27, 2004, at his residence located at 141 Camwood in Magnolia, Montgomery County, Texas (GX 1 and 2–photographs of residence; Doc. 158, pp. 252-53).  Williams invited his friends, which included persons associated with the Cypress Creek Emergency Medical Services, and various law enforcement agencies.  Among the invitees to the party was Steven Cosby, a CCEMS employee (Doc. 158, pp. 262-67, 269-75, 290; Doc. 159, pp. 713-18; Doc. 160, pp. 734-36).

During the party, Williams, a full-time medic with the CCEMS and a non-paid volunteer reserve police officer with the Hempstead Police Department, was observed by Cosby retrieving a "flash bang" or stun grenade device from the trunk of

13

Williams's personal vehicle. Cosby knew that Williams intended to throw the device at an unsuspecting invitee on the premises when the "victim" would not expect such thing to occur. Williams had been drinking alcohol. Later, Cosby heard a "hissing" sound and saw that Williams was kneeling on the ground. Cosby saw Williams throw the device toward him, landing near Cosby's feet. As Cosby tried to jump away, the device exploded, blasting one of Cosby's feet. Cosby's foot was partially amputated in the blast from the device Williams threw as a moronic prank. Cosby displayed his injuries to the jury (Doc. 157, pp. 119-29, 135, 234; Doc. 158, pp. 288-90; Doc. 161, pp. 109-1010, 1020-1021, 1025-26, 1046, 1080-81).

This was not the first time Williams pulled a dangerous prank. On July 18, 2004, Williams, after drinking alcohol, placed a flash bomb beneath Hempstead Police Department officer Brock Martin's patrol unit while Officer Martin was parked at a Denny's restaurant in Hempstead. The device exploded. No one was injured in that incident, but Williams was observed laughing at Martin (Doc. 157, pp. 77-96–testimony from Brock Martin; Doc. 157, pp. 97-118–testimony from Officer Heather Martin; Doc. 158, p. 265). Williams later falsely advised the police chief that Martin had a "blowout," and subsequently tried to pressure his colleagues to falsely claim that the incident was a "training exercise" (Doc. 157, pp. 106-12).

Another incident occurred one and one-half years prior to August 27, 2004, on

New Year's Eve involving Williams.  Williams threw another party at his residence, and Williams's colleagues were outside playing horseshoes, when Williams threw a "flash bang" at fellow Hempstead Police Officer Jason Martinez.  Martinez ran and was not injured when the device exploded (Doc. 157, p. 122; Doc. 158, pp. 266-69).

Returning to the August 27, 2004 incident, the Magnolia Volunteer Fire Department and EMS from Montgomery County Hospital District received a 911 phone call at 10:07 pm, in which the caller advised that a person received traumatic injuries at the 141 Camwood location in Magnolia. EMS first responders arrived at the scene as well as an investigator with the Montgomery County Fire Marshals Office, Bradley England (Doc. 159, pp. 705-19; Doc. 160, 734-820).

EMS determined that Cosby was injured and had a portion of his foot partially amputated.  The eight to ten men present on the scene initially indicated that Cosby was injured by a chainsaw (Doc. 157, pp. 145-46, 204-14, 233-34, 237).  Later, it was revealed that a "flash bang" had been employed, causing Cosby his injuries. Investigator Bradley encountered Williams, and Williams falsely claimed that the incident involved fireworks (Doc. 157, pp. 156-67, 243; Doc. 160, pp. 747-49; Doc. 161, p. 1022; see also Doc. 158, pp. 264-65).  Williams claimed that Cosby stepped onto the explosive device when it blew up and injured Cosby.  Williams told other law enforcement agents that Cosby was injured due to a tire blowout (Doc. 161, pp.

1022-23).Williams claimed not to have known what type of fireworks was involved, and led the Fire Marshal investigator to the place where the device detonated. Investigator Williams found a hole, one foot in circumference and about five inches deep.  The area had been "cleaned" and tampered with (Doc. 158, pp. 261-63; GX 131–"flash bang" device).

Based upon the information that the Fire Marshals investigator uncovered, he enlisted the assistance of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to assist in the post-blast investigation.  A search warrant was drafted and executed on August 30, 2004, at Williams's residence on Camwood (Doc. 158, pp. 252-56).

The location of the blast was further tampered with, having been filled in since August 28, 2004.  The investigating officers, which included an arson investigator from the Houston Police Department, executed the warrant on Williams's Ford Crown Victoria, and they found a Defense Technology Specification Manual and a safety lever to a "flash bang" (Doc. 158, pp. 392-98; GX3–photograph of search of vehicle, with ATF Special Agent David Bock in the picture; GX 5).  A used "distraction device" hull was found in the carport where the vehicle was parked. In total, 23 pieces of explosive debris was seized as well as soil from the crater caused by the "flash bang," and documentary evidence of Williams's residency at the

location (Doc. 158, pp. 253-56; GX 9–photograph of metal can with soil).

ATF agents later were permitted to inspect a Hempstead Police Department office desk belonging to Williams. Williams had extensive law enforcement training, and he even served a period of time as an ATF agent (Doc. 158, pp. 297-301). Three ammo cans marked "Malouff" were found under Williams's desk and 77 "distraction devices" were found by Williams's desk, including stun grenades that were marked with serial numbers and some that did not have serial numbers (Doc.158, pp. 434-56; GX 57–stun grenade found beneath Williams's desk; GX 113–rubber stun grenade found beneath William's desk).  Charles Malouff, Jr. later advised the investigators that he left the stun grenades and other distraction devices in Williams's custody for use in training; however, Malouff never knew that Williams maintained possession of "live" stun grenades and other explosive devices.  Williams was also shown to have ordered 35 training flash bangs and 24 actual flash bangs (Doc.158, pp. 304-07, 414-18; GX 137–billing invoice addressed to Malouff; Doc.159, pp. 595-704 (Malouff's testimony).

The various stun and flash grenades, illuminator and rubber smoke grenades were identified in the indictment (Doc.158, pp. 383-84; GX 37–summary chart; *see e.g.* GX 59–explosive device; Doc.159, pp. 558-59).  The devices were required to be registered when transferred, and properly stored (Doc.159, pp. 307-18, 329-32,

337-57, 373-79).  They were examined and x-rayed, and found to be operable (Doc.159, pp. 549-69, 585; GX 38–a disassembled "flash bang" device).

Testimony was developed concerning the legal responsibilities of manufacturers or importers to license and register destructive devices within 24 hours with the National Firearms Registration and Transfer Record in Washington, D.C. (NFRTR), filing a "form two," notice of manufacture by the manufacturer of an explosive device (Doc.158, pp. 306-07).  The record describes specifically the weapon or destructive device, the date of registration, and the person or entity entitled to possession of the device (Doc.158, pp. 307-08).  An applicant, who wants to transfer the weapon or device, must notify ATF via a "transfer form" which is required for tax purposes. In actuality, there are five forms that must be completed for a transfer (Doc.158, p. 320). Next, the possessor of the device, the transferor, identifies the person or entity to which the transfer is to be made, the transferee, and the device is identified.  A tax is then levied on the transaction, and the form is submitted to ATF for "pre-approval" before the transaction may be consummated (Doc.158, pp. 308-10).

Five exceptions exist to avoid payment of a transfer tax.  Special occupational taxpayers are exempt from the payment of a $200 since they previously paid the ATF appropriate taxes.  A second exemption from tax payment arises in those cases where

the device or weapon is unserviceable.  Two additional exemptions exist where the federal government transfers to a state or state organization, and the state or state organization transfers the devices to a police organization.  Finally, an exemption arises where a lawful agent in the United States owns an ATF weapon. While the tax may be exempt, the requirement of registration of transferred devices remains (Doc.158, pp. 310-11).

Lawful possessors or recipients of destruction devices or "flash bangs" are to store the materials in facilities apropos for the respective category of destructive devices. 18 U.S.C. § 842(j); 27 C.F.R. §§ 55.207, 55.208 and 55.218 (eff. April 1, 2002) (Doc.19).[1] Destruction devices are categorized in one of five groups by degree of destructive capability: three categories for "high explosives;" one category for "low explosives;" and one category for "blasting agents." In other words, there are separate and distinct approved storage facilities for "high explosives" in categories one through three. Different approved storage facilities for "low explosives" are set forth in category four, and "blasting agents" fall in category five (Doc.158, pp. 314-16).

---

[1] The Code of Federal Regulations redesignated the provisions, 27 CFR § 555.207 (type one magazine storage facility), 555.208 (type two magazine storage facility)  and 555.218 (table of distances for storage facilities) (eff. Jan. 24, 2003). 27 CFR § 555.209 (type three magazine storage facility); 27 CFR §555.210 (type four magazine storage facility); 27 CFR § 555.211 (type five magazine storage facility) identify the remaining storage facilities for various devices.

Category type one devices, also known as "magazines", are to be stored in tunnels or bunkers.  Type two category devices, known as portable or mobile storage magazines, are to be contained in quarter inch thick steel from top to bottom, lined by two inches of  hardwood, with two padlocks to every door that accesses the devices (Doc.158, pp. 311-14; GX 148–example of type two storage facility). A category type three facility is "normally used in the transportation of explosives."  It must always be attended, and is maintained in a "day box." (Doc.158, pp. 314-16).

The explosives involved in this case are type one category devices or "high explosives", which were required to be stored in category one, two or three facilities. (Doc.158, pp. 316). GX 152, a transfer registration record from Precision Ordnance Products to Bertram Police Department concerning the destruction devices confiscated at 1603 Ash Meadow in Houston, could not be transferred to a individual person; it had to be transferred to a law enforcement agency (Doc.158, pp.  321-24; Doc.161, p. 1015).

The evidence supporting each count is found as follows:

Count one– GX 140 lists the 78 devices found in Williams's office at 1603 Ash Meadow (Doc.161, p. 1015); Williams admitted to knowing possession of all of the devices, 39 of which are identified in  count one (Doc.161, p. 991); Malouff testified that he gave Williams the devices (Doc.159, pp. 630-31); the Precision Ordnance Products devices were used by Williams in his various pranks (Doc.161, pp. 1010, 1020-21, 1034).

Count two–GX 140 lists the remaining devices, including 34 that were transferred to Williams by Malouff (GX 155-57–invoices demonstrating the devices were sold by Malouff to Williams).

Count three–relates to the "prank" pulled by Williams on July 18, 2004 on Brock Martin (Doc.158, pp. 264-65; GX 149–reflects that Williams has no destructive devices registered to him in the NFRTR (Doc.158, pp. 306-26).

Count four –relates to the knowing possession of the flash bang used by Williams on August 27, 2004, at his residence;

Count five–relates to the five "flash bang" devices that have obliterated serial numbers or lack a serial number as set forth on GX 140; and

Count six–relates to the improper storage of explosives, including the substance of perchlorate annon [sic] in the 78 "flash bangs", found in Williams's possession at 1603 Ash Meadow, Houston, Texas (Doc.158, pp. 387-392, testimony of Stephanie Ross, an ATF forensic chemist).

Williams's defense to the prosecution was a public authority defense, namely, that he was an unpaid reserve deputy in the City of Hempstead Police Department, and was authorized to possess and transfer the stun grenades and other distraction devices based upon memoranda of understanding between the FBI, ATF, the Texas National Guard, and the Texas Department of Public Safety and the CCATT (Doc.161, pp. 991-99, 1003; GX 32, 40-44, 49–letters from various agencies memorializing agreements between federal and state agencies and CCATT). The government noted that the letters (GX 32, 40-44 and 49) were authored by Williams when Williams was employed by ATF between 1989 and 1998, and the letters did not

indicate that CCATT was authorized to possess or transfer any flash bang or stun grenades (Doc.159, p. 395; Doc.161. pp. 1004-09). Nevertheless, Williams had in his possession material safety data sheets for each specific model of destruction device which explained each specific model. Williams also possessed a manual in his office identifying each different type of model of destruction device. The devices were all registered to the Bertram Police Department (GX 152).

8.

**Ineffective Assistance of Appellate Counsel**

A.

Williams challenges appellate counsel's failure to attack the district court's refusal to instruct the jury on the "public authority defense." Counsel's failure to raise this issue was not deficient because Williams failed to establish the required elements to support the affirmative defense of public authority. "Public authority" is an affirmative defense where:

> –the defendant
> –reasonably relies
> –upon the authority of a government official
> –to engage him in covert activity.

*Spires*, 79 F.3d at 466 n.2 (citing *Achter*, 52 F.3d at 755); *see* Seventh Circuit Jury

22

Pattern Jury Instruction 6.07 (1999)[2].

Further, trial counsel recognized that there was no evidence of a "covert activity" (Doc. 161, pp. 1804-09). *See and compare United States v. Hidalgo*, 226 Fed. Appx 391,  398 (5th Cir. 2007) (unpublished) ("The trial transcripts reveal that Hidalgo's attorney agreed with the district court that the evidence did not present elements of the public authority defense.").

Second, counsel was unable to identify any federal government agent who could have or did have authority to empower Williams to engage in the criminal acts in question (Doc. 161, pp. 1809-13). Prior to trial, Williams identified Royce Glenn Smith, Charles A. Malouff, Jr., Charlie Jones, and Brad England as the authorizing government agents (Doc. 58). During trial, Malouff (Doc. 159, pp. 1300-1410), England (Doc. 159, pp. 1410-24; Doc. 160, pp. 1439-1525, 1595-98), Sheriff Charlie Jones  (Doc. 160, pp. 1569-78), and Hempstead Police Chief Royce Glenn Smith (R.

---

[2] A defendant acts under public authority if:
(1) that defendant is affirmatively told that his/her conduct would be lawful;
(2) the defendant is told this by an official of the [United States] government; [and]
(3) the defendant actually relies on what the official tells him/her in taking the action[; and,
(4) the defendant's reliance on what he/she was told by the official is reasonable in light of the circumstances].
In considering whether a defendant actually relied on representations by an official that his/her conduct would [be] lawful, you should consider all of the circumstances of their discussion, including the identity of the official, the point of law discussed, the nature of what the defendant told, and was told by, the official, and whether that reliance was reasonable.

160, pp. 1610-60) testified that they had no authority and did not empower Williams to engage in the charged conduct.

Third, Williams, testified in his own defense (R. 161, pp. 1694-1753). He confirmed that, although he was an unpaid reserve deputy in the city of Hempstead Police Department, he relied upon memoranda of understanding between the FBI, ATF, the Texas National Guard, and the Texas Department of Public Safety and the CCATT to support his claim of public authority (Doc.161, pp. 1696-1704, 1708; GX 32, 40-44, 49–letters from various agencies memorializing agreements between federal and state agencies and CCATT). However, the letters (GX 32, 40-44 and 49) were authored by Williams when Williams was employed by ATF between 1989 and 1998, and the letters did not indicate that CCATT was authorized to possess or transfer any flash bang or stun grenades thereafter (Doc.158, p. 1100; Doc.161. pp. 1709-14). He did not claim participation in a covert activity.

Fourth, counsel for Williams conceded that his theory for the defense could not rely upon Fifth Circuit precedent; instead he relied upon language from the Eighth and Ninth Circuits (Doc. 161, pp. 1804-13).

Attorney Adler did not err by refusing to raise the issue of "public authority defense" on appeal when the elements of the affirmative defense were not established. Even on direct appeal, the Fifth Circuit will not revese a conviction "for failure to

instruct the jury on a defense unless the requested but omitted instruction has an evidentiary basis in the record which would lead to an acquittal." *Spires*, 79 F.3d at 466.

As noted previously, the Sixth Amendment does not require appellate counsel to raise every non-frivolous claim available on appeal. *Jones,* 463 U.S. at 751-52 Where an ignored issue is identified, the issue must be "clearly stronger" than the issues presented in order for the "presumption of effective assistance of counsel [to] be overcome."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Here the identified "ignored" issue was clearly *not stronger* than the issues pursued on appeal. No relief is warranted.

## B.

In an attachment to his § 2255 petition, Williams identifies "facts" outside the record to support his ground for relief. These "facts" do not establish the elements of the affirmative defense of public authority. Moreover, many of the "facts" are unsubstantiated or merely cumulative of Williams's defensive posture.

## C.

Contained in the body of "attachment A" is a secondary claim of ineffective assistance of trial counsel. The "claim" is alleged in conclusory terms. He does not attach any affidavits or allege how or where trial counsels's representation was

deficient. The claimed-attorney error is too vague, speculative and conclusory to warrant further review. *See United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993) (vague, conclusory claim subject to dismissal); *United States v. Acklen*, 47 F.3d 739, 743-44 (5th Cir. 1995) ("Mere conclusory" statements are insufficient to require limited discovery or an evidentiary hearing.). Moreover, the allegations are inadequate to support a claim of ineffectiveness. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992). Williams does not share the identity of any witness, or even allege that he *identified* for his trial attorneys the identity of a witness *prior to trial*, or that the witness(es) was/were available to testify, who could have otherwise established the "facts" outside the record. He also does not identify what the prospective witness(es) would attest out of his list of "facts."  No relief is warranted under this theory.

### 9.

No evidentiary hearing is necessary to resolve issues presented. *United States v. Samuels*, 59 F.3d 526, 530 & ns.16-17 (5th Cir. 1995) (citations omitted); *Bartholomew*, 974 F.2d at 41-42. Williams alleges no facts which would be the proper subject of a motion to correct sentence, vacate the judgment, or which would warrant an evidentiary hearing under either 28 U.S.C. § 2255. Therefore, the government moves for dismissal, *see and compare United  States v. Bradley*, 400

F.3d 459, 463-65 (1st Cir. 2005), and in the alternative, summary judgment.

10.

Williams's § 2255 pleading should be dismissed.

> Respectfully submitted,
>
> JOSE ANGEL MORENO
> United States Attorney
>
>
>  /s/Jeffery A. Babcock
> Jeffery A. Babcock
> Assistant United States Attorney
> P. O. Box 61129
> Houston, Texas  77208-1129
> 713-567-9363
> Bar No. 01481400
>
> ATTORNEYS FOR APPELLEE

<u>CERTIFICATE OF SERVICE</u>

I, Jeffery A. Babcock,  Assistant United States Attorney, do hereby certify that

a true and correct copy of the above pleading has been forwarded, postage prepaid,

today, April 30, 2010, addressed to:

Eugene H. Williams, Jr.
No. 66170-179
FCI Safford
PO Box 9000
Safford, AZ 85548

 /s/ Jeffery A. Babcock             
JEFFERY A. BABCOCK
Assistant United States Attorney